## IN THE UNITED STATES DISTRICT COURTFOR THE WESTERN DISTRICT OF OKLAHOMA

MATTHEW JAMES KELLN,     )
                                  )
       Petitioner,          )
vs.                          )         NO. CIV-15-0888-HE
                                  )
JANET DOWLING, Warden,     )
                                  )
       Respondent.       )
                                  )

## <u>MEMORANDUM OPINION</u>

Petitioner, Matthew James Kelln, a state court prisoner, has filed a petition for a writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 1. Petitioner challenges the conviction entered against him in Ellis County District Court Case No. CF-2011-3. In that case, petitioner was found guilty by jury of murder in the second degree and was sentenced to twenty years in prison (Tr. 4/17/12, 6). Petitioner appealed his conviction to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). The OCCA affirmed in an unpublished opinion, <u>Kelln v. State</u>, No. F-2012-375 (Okla. Crim. App. Sept. 18, 2013). Petitioner was also denied post-conviction relief. <u>Kelln v. State</u>, No. PC 2015-0507 (Okla. Crim. App. Aug. 5, 2015) (unpublished). <u>See</u> Resp., Exs. 3 and 7 (copies of the OCCA's opinions).

Petitioner brings six grounds for relief, all of which have been presented to the OCCA. Respondent has responded to the petition and petitioner has replied. Docs. 14 and 20. In his reply, petitioner has requested an evidentiary hearing. He has also requested the appointment of counsel and an investigator. Because all of petitioner's grounds for relief

were presented to the OCCA and addressed on the merits, and because the court has concluded that the OCCA was reasonable in its denial, the court's review is limited to, and must be decided on, the record that was before the OCCA. Cullen v. Pinholster, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Further exploration of petitioner's claims is therefore unwarranted, and his requests for a hearing, counsel, and an investigator are all hereby denied. See Jones v. Warrior, 805 F.3d 1213, 1222 (10th Cir. 2015) (denying an evidentiary hearing under Pinholster because a petitioner failed to satisfy § 2254(d)); Anderson v. Att'y Gen. of Kan., 425 F.3d 853, 859 (10th Cir. 2005) ("[A]n evidentiary hearing is unnecessary if the claim can be resolved on the record."); Rojem v. Gibson, 245 F.3d 1130, 1139 (10th Cir. 2001) (denying a capital habeas petitioner's request for an investigator because he failed to show "reasonable necessity"); Swazo v. Wyo. Dep't of Corr., 23 F.3d 332, 333 (10th Cir. 1994) (the appointment of counsel in § 2254 cases is discretionary).

## I. Facts.

Petitioner was the driver in a single truck accident which caused the death of his front seat passenger. A sample of petitioner's blood was taken at the hospital where he was treated for his injuries (J. Tr. 2, 271-81, 291-94, 322-23, 362). His blood alcohol level was above the legal limit (.12), and he had prior drunk driving convictions (State's Exs. 19, 46, and 50). Additional facts will be referenced herein as they relate to the individual grounds for relief raised by petitioner.

## II.  Standard of Review.

In order to obtain relief, petitioner must satisfy the requirements of 28 U.S.C. § 2254(d).  Section 2254(d) requires petitioner to show that the OCCA's adjudication of his claims either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See Pinholster, 563 U.S. at 181 (acknowledging that "[t]he petitioner carries the burden of proof").  The focus of this statutory provision is on the reasonableness of the OCCA's decision.  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007).  In other words, "[i]t is not enough that [this] court, in its independent review of the legal question, is left with a firm conviction that the [OCCA] was erroneous."  What is required is a showing that the OCCA's decision is "objectively unreasonable."  Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citation omitted).

The Supreme Court has repeatedly acknowledged that Section 2254(d) "'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court,'" and that "[i]f [it] is difficult to meet, that is because it was meant to be."  White v. Wheeler, 577 U.S. ___, 136 S. Ct. 456, 460 (2015) (quoting Burt v. Titlow, 571 U.S. ___, 134 S. Ct. 10, 16 (2013)); Harrington v. Richter, 562 U.S. 86,

102 (2011). Section 2254(d) "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." Richter, 562 U.S. at 102. What remains, then, is a very narrow avenue for relief, one that permits relief only "*where there is no possibility* fairminded jurists could disagree that the [OCCA's] decision conflicts with [the Supreme] Court's precedents." Id. (emphasis added).

> Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 102-03 (citation omitted).

## III. Analysis.

### A.    Ground One:        Ineffective Assistance of Counsel.

In his first ground for relief, petitioner asserts that trial counsel was ineffective for failing to (1) inform the trial court of a juror's partiality and bias; (2) effectively impeach a State's witness; and (3) obtain an expert regarding his blood alcohol content. Because trial counsel also represented him on direct appeal, petitioner additionally asserts that counsel was ineffective on appeal as well because he failed to raise these challenges to his own performance. Petitioner raised this claim in post-conviction and the OCCA denied relief on the merits. Kelln, No. PC 2015-0507, slip op. at 1-3. For the following reasons, the court concludes that no relief is warranted on Ground One.

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." Titlow, 134 S. Ct. at 18. Whether counsel has

4

provided constitutional assistance is a question to be reviewed under the familiar standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), which the OCCA did in denying petitioner relief. <u>Kelln</u>, No. PC 2015-0507, slip op. at 2-3. <u>Strickland</u> requires a defendant to show not only that his counsel performed deficiently, but that he was prejudiced by it. <u>Strickland</u>, 466 U.S. at 687.

To satisfy the deficient performance prong, a defendant must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." <u>Id.</u> The assessment of counsel's conduct is "highly deferential," and a defendant must overcome the strong presumption that counsel's actions constituted "'sound trial strategy.'" <u>Id.</u> at 689 (citation omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." <u>Id.</u> at 690. As <u>Strickland</u> cautions, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Id.</u> at 689. Therefore, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Id.</u> Within "the wide range of reasonable professional assistance," "[t]here are countless ways to provide effective assistance in any given case[, and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." <u>Id.</u>

As for prejudice, <u>Strickland</u> requires a defendant to show that his counsel's errors and omissions resulted in actual prejudice to him. <u>Id.</u> at 687. In order to make a threshold showing of actual prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694.

As applied to appellate counsel challenges, <u>Strickland</u> requires a showing that (1) appellate counsel's actions on appeal were objectively unreasonable and (2) but for counsel's unreasonable actions, there is a reasonable probability that petitioner would have prevailed on appeal. <u>Smith v Robbins</u>, 528 U.S. 259, 285-86 (2000); <u>Miller v. Mullin</u>, 354 F.3d 1288, 1297 (10th Cir. 2004) (quoting <u>Ellis v. Hargett</u>, 302 F.3d 1182, 1186-87 (10th Cir. 2002)). When an appellate counsel claim concerns omitted issues, as in the present case, <u>Strickland's</u> first prong requires a showing that counsel unreasonably omitted "nonfrivolous issues." <u>Robbins</u>, 528 U.S. at 285. When counsel has filed a brief on the merits, it is difficult to show his incompetence for failing to raise a particular claim. <u>Id.</u> at 288. Appellate counsel does not have an obligation to raise every possible claim irrespective of its merit. In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail . . . ." <u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986) (quoting <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983)). "This has assumed a greater importance in an era when oral argument is strictly limited in most courts–often to as little as 15 minutes–and when page limits on briefs are widely imposed." <u>Jones</u>, 463 U.S. at 752-53.

In denying petitioner relief, the OCCA assessed the claim through the lens of appellate counsel ineffectiveness, but because the claim involved omitted issues, the OCCA acknowledged that a merits review of the omitted issues was necessary. Relying on the trial court's analysis of the omitted issues, the OCCA determined that petitioner had not shown that his counsel was ineffective.

> We set forth in <u>Logan</u> that in reviewing a claim of ineffective assistance of appellate counsel under <u>Strickland</u>, a court must look to the merits of the issues that appellate counsel failed to raise. Only an examination of the merits of any omitted issues will reveal whether appellate counsel's performance was deficient and also whether the failure to raise the omitted issue on appeal prejudiced the defendant; i.e., whether there is a reasonable probability that raising the omitted issue would have resulted in a different outcome in the defendant's direct appeal. In the present case the trial judge looked to the merits of the issues raised and found no error. Petitioner's application to this Court has not shown that the trial judge erred. Petitioner has not shown that he was denied the effective assistance of trial and appellate counsel.

<u>Kelln</u>, No. PC 2015-0507, slip op. at 3. This determination that petitioner's counsel was not ineffective is entitled to AEDPA deference, and as the Supreme Court has held, when the limits imposed by the AEDPA intersect with the deference afforded counsel under <u>Strickland</u>, petitioner faces a significant hurdle to relief.

> Surmounting <u>Strickland's</u> high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing

professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so[.] The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard.

<u>Richter</u>, 562 U.S. at 105 (internal quotation marks and citations omitted).

## Juror Bias

Petitioner's first claim concerns Juror Kuhlman and counsel's failure to inform the trial court of her "highly egregious and presumptively prejudicial partiality and bias . . . ." Pet. at 5. Petitioner makes two assertions regarding Mrs. Kuhlman's ability to serve as an impartial juror. First, he states that she "discussed the case in depth" with the victim's mother "in the hallway prior to the start of voir dire." Second, he states that "prior to leaving her place of employment the day voir dire began[, Mrs. Kuhlman] openly vowed that Petitioner would 'hang' if she were to be chosen as a juror in [the] case." Id. at 4.

Although Mrs. Kuhlman did not know either petitioner or the victim, she stated in voir dire that she knew about the case, had discussed it with others prior to that day, and that she knew both of the families. Petitioner's cousin was currently working for her, and the victim's mother and aunt had previously worked for her. Mrs. Kuhlman acknowledged that she had spoken to the victim's family members that day but stated that she did not discuss the case with them. In response to defense questioning, Mrs. Kuhlman expressed

that it might be best if she did not serve; however, defense counsel's request to have her excused was overruled after the following inquiry by the court:

THE COURT: Mrs. Kuhlman, having asked - - - having been asked these questions, do you - - - I know you had some contact with these people, but do you really know of any reason why you cannot be a fair and impartial juror to both sides today?

PROSPECTIVE JUROR KUHLMAN: Not really, because I know both sides.

THE COURT: Okay.

PROSPECTIVE JUROR KUHLMAN: You know, cursory. I don't know the boys.

THE COURT: Can you be fair to the State of Oklahoma?

PROSPECTIVE JUROR KUHLMAN: Yes.

THE COURT: Can you be fair to the Defendant?

PROSPECTIVE JUROR KUHLMAN: Yes.

THE COURT: Do you think you can follow the law that the Court gives you?

PROSPECTIVE JUROR KUHLMAN: Yes.

THE COURT: And its instructions?

PROSPECTIVE JUROR KUHLMAN: (Nods head.)

THE COURT: Okay. Um, in all candor, can you do that and will you do that?

PROSPECTIVE JUROR KUHLMAN: I mean, I can.

THE COURT: Okay.

PROSPECTIVE JUROR KUHLMAN: I mean, I have no doubt that I can.

THE COURT:        Okay.  All right.  I will overrule your exception.

(J. Tr. 1, 232-42).

Beyond what transpired during voir dire, petitioner has come forth with the following additional evidence:[1]

1.    An affidavit from Dannette Solis (Ex. 1 to Resp't's Ex. 4), whom petitioner identifies as a sheriff's deputy.  In her affidavit, Ms. Solis states that she saw Diane Akins, the victim's mother, speaking to jurors as they left the courtroom.  According to Ms. Solis, Mrs. Akins was asking all jurors to find petitioner guilty and send him to prison.  Ms. Solis makes no specific reference to Mrs. Kuhlman.

2.    An affidavit from Cathy McCormick (Ex. 2 to Resp't's Ex. 4), a prospective juror who was dismissed.  Ms. McCormick states in her affidavit that she interacted with Mrs. Akins and Joyce Burrows (identified by petitioner as Mrs. Akins' friend) outside the courtroom on the way to jury duty.  She states that they told her that petitioner was guilty and that she should find him guilty.  Ms. McCormick states that she told the sheriff what happened and that the sheriff told the judge.  Ms. McCormick makes no reference to Mrs. Kuhlman.

3.    An affidavit from Audra Tomlinson (Ex. 3 to Resp't's Ex. 4), who states that she was present for the trial and witnessed Mrs. Akins and Mrs. Burrows talking to jurors about petitioner's guilt.  She also states that information about Mrs. Kuhlman "was brought to [her] attention . . . ."  The information brought to her attention, but not witnessed by her personally, was that Mrs. Kuhlman discussed jury selection with Mrs. Akins and Mrs. Burrows and that John Q. Kelln, petitioner's uncle, was told by Katina Schultz, a coworker of Mrs. Kuhlman's, that Mrs. Kuhlman had made a statement that she would "'hang'" petitioner if she made it on the jury.

---

[1] *Items 1 through 6 were presented to the OCCA in his post-conviction application and are therefore properly considered in evaluating petitioner's claim.  Items 7 and 8 were not, and therefore their consideration is precluded by* <u>Pinholster</u>, *563 U.S. at 181.  However, even if the court were to give consideration to these additional affidavits, it would not change the court's decision.  Although petitioner refers to these new affidavits as firsthand accounts, they are also hearsay.*

4.      An affidavit from Katina Knowles (Ex. 8 to Resp't's Ex. 4), a coworker of Mrs. Kuhlman's, who states that Mrs. Kuhlman and Mrs. Akins were friends and that Mrs. Kuhlman had told her on her way to jury duty that "if she could get on the jury she would do anything to see that [petitioner] was found guilty." She also states that after jury selection, Mrs. Kuhlman "boasted to Kayleen Cox and Wes Moular [sic] . . . that she had lied to the court to gain access to the jury and was selected as a juror and would do all she could to find [petitioner] guilty."

5.      An affidavit from petitioner's father, James Mark Kelln (Ex. 4 to Resp't's Ex. 4). Mr. Kelln states that he recalls Mrs. Akins making contact with jurors regarding petitioner's guilt. He does not identify Mrs. Kuhlman as one of the jurors. He also states that at some point, a deputy instructed the comments to stop. Mr. Kelln also references a phone call he received from his brother, John. In that conversation, Mr. Kelln was told about Ms. Knowles overhearing Mrs. Kuhlman say "that if selected she would find [petitioner] guilty." Mr. Kelln states that he told trial counsel about the information received from his brother.

6.      An affidavit from petitioner's uncle, John Quentin Kelln (Ex. 5 to Resp't's Ex. 4). In the affidavit, Mr. Kelln identifies Ms. Knowles as his niece and he relates a phone call he received from her during trial. Ms. Knowles told Mr. Kelln that she had overhead Mrs. Kuhlman say that she would find petitioner guilty if she was selected to serve on his jury. Mr. Kelln states that he relayed this information to his brother, John.

7.      An affidavit from Norma (Kayleen) Cox (Reply, Ex. 1), in which she states that before petitioner's trial, Mrs. Kuhlman told her "she would do anything to be on the jury and to see that [petitioner] was convicted."

8.      An affidavit from Donald Welsey Molnar (Reply, Ex. 2), in which he states that Mrs. Kuhlman told him and Ms. Cox "that she would do anything to get on the jury so she could find [petitioner] guilty."

Petitioner has a constitutional right to an impartial jury. As the Tenth Circuit recently acknowledged in Stouffer v. Duckworth, 825 F.3d 1167, 1177 (10th Cir. 2016), cert. denied 37 S. Ct. 1226 (2017),

"The Sixth Amendment as incorporated by the Fourteenth Amendment guarantees the right of a trial by jury in all state criminal cases."

Goss v. Nelson, 439 F.3d 621, 627 (10th Cir. 2006). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Id. (quoting Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)). "Included in that right is the right to a jury capable and willing to decide the case solely on the evidence before it." United States v. Brooks, 569 F.3d 1284, 1288 (10th Cir. 2009) (quotation omitted). "Though no trial can be perfect, one touchstone of a fair trial is an impartial trier of fact." United States v. Cerrato–Reyes, 176 F.3d 1253, 1258–59 (10th Cir. 1999) (citation, quotation, and brackets omitted). "Because impartial jurors are the cornerstone of our system of justice and central to the Sixth Amendment's promise of a fair trial, we guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made." Stouffer, 738 F.3d at 1213 (quotations omitted).

The question, therefore, is whether trial counsel was ineffective in protecting and preserving petitioner's right to an impartial jury, and given that the OCCA addressed the merits of this claim and found that he was not, whether petitioner has demonstrated that the OCCA's decision is an unreasonable one. Under the facts and circumstances of the case, petitioner has not demonstrated his entitlement to relief.

Assessment of petitioner's claim must begin with what counsel did do. It was counsel who brought to light that Mrs. Kuhlman knew the victim's family and had spoken to them that very day at the courthouse. Counsel even elicited Mrs. Kuhlman's agreement that based on her connection to and interaction with the victim's family, it would probably be inappropriate for her to serve on the jury (J. Tr. 1, 238-41). He also asked the trial court to excuse her (id. at 241).

Although petitioner asserts that counsel should have done more based upon the information contained in the affidavits, only one of the affidavits, the one from petitioner's

father, indicates that counsel was aware of the information.[2]  In his affidavit, Mr. Kelln states that his brother called him and told him that Ms. Knowles overheard Mrs. Kuhlman say "that if selected she would find [petitioner] guilty."[3]  Mr. Kelln states that he informed counsel of this information during jury selection.  Ex. 4 to Resp't's Ex. 4.  Assuming counsel was told, the fact that he did not use the information does not equate to deficient performance.  As the trial court found in discounting this evidence, it was not only hearsay, but multiple layers of hearsay.  Resp't's Ex. 5 at 1.  It was therefore reasonable for counsel to put aside this weak and unsupported evidence and pursue Mrs. Kuhlman's removal based on her connection with the victim's family.  See Nguyen v. Reynolds, 131 F.3d 1340, 1349 (10th Cir. 1997) ("An attorney's actions during voir dire are considered to be matters of trial strategy.") (citing Teague v. Scott, 60 F.3d 1167, 1172 (5th Cir.1995)).

Petitioner was also not prejudiced by counsel's failure to use the alleged statement by Mrs. Kuhlman.  Petitioner argues that had counsel brought this information to the trial court's attention, he would have received a Remmer hearing.  Pet. at 5.  In Remmer v. United States, 347 U.S. 227, 229 (1954), the Supreme Court held that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed

---

[2] *Petitioner admits that the information about Mrs. Kuhlman allegedly discussing the case with the victim's mother was not known until after trial. Pet. at 4.  Although petitioner does not mention when he learned of the information, the affidavits addressing this issue were all executed in November 2014, over two years after trial.  See Exs. 1-4 to Resp't's Ex. 4.*

[3] *Although petitioner asserts that Mrs. Kuhlman vowed to "'hang'" him, none of the three people who allegedly overheard Mrs. Kuhlman's statement claim that she used the word "hang." Pet. at 4; Ex. 8 to Resp't's Ex. 4; Reply, Exs. 1 and 2.*

presumptively prejudicial . . . ."  A <u>Remmer</u> hearing is therefore used to investigate "credible evidence of jury tampering."  <u>Stouffer v. Trammell</u>, 738 F.3d 1205, 1213 (10th Cir. 2013).  A statement allegedly made by Mrs. Kuhlman about petitioner's guilt prior to trial is not evidence of jury tampering invoking <u>Remmer</u>.

In addition, there is no reasonable probability that the result of petitioner's trial would have been different had counsel brought this information to the trial court's attention.  Again, assuming counsel had the information, it came from petitioner's father who heard it from his brother who heard it from his niece who overheard Mrs. Kuhlman.  It was triple hearsay, which not only lacked evidentiary value on this basis but was additionally subject to question given the familial relationships among the parties.  Had counsel brought this information to the trial court, there is no reasonable probability that Mrs. Kuhlman would have been excused, given petitioner's questionable evidence and Mrs. Kuhlman's in-court responses which reflected her ability to serve as an impartial juror.  The absence of prejudice is also supported by the clear, simple, and overwhelming evidence against petitioner, a repeat drunk driving offender who failed to navigate a curve causing a single truck accident which killed his front seat passenger.

As for counsel's effectiveness on appeal, it is clear that an attorney cannot be ineffective for raising a meritless claim.  <u>See</u> <u>Freeman v. Atty. Gen.</u>, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim . . . .").  For the reasons set forth above, counsel was not ineffective at trial with respect to the alleged statement made by Mrs. Kuhlman, and therefore he was not thereafter ineffective for not raising the claim on direct appeal.

The same is true for petitioner's other allegation regarding Mrs. Kuhlman and what may have occurred between her and the victim's mother outside the courtroom. First, it is unknown when this information was learned. Petitioner only states that "it was brought to light after the conclusion of the trial . . . ." Pet. at 4.[4] Petitioner's trial was in February 2012. The affidavits supporting this allegation are all from November 2014, <u>see</u> n.2, <u>supra</u>, which is two years after his direct appeal brief was filed (Resp't's Ex. 1) and over a year after his direct appeal was decided. If the information was not discovered until November 2014, which is how it appears, then counsel cannot be deemed ineffective for failing to raise it on appeal. But in any event, the information petitioner has provided in support of this claim does not demonstrate its merit. Taking petitioner's affidavits at face value, they state that the victim's mother and her friend were outside the courtroom telling prospective jurors to find petitioner guilty. However, only one of the affidavits, Ms. Tomlinson's, references Mrs. Kuhlman having contact with the victim's mother at trial, and she has no firsthand knowledge of it. Ms. Tomlinson states only that the information was brought to her attention, and according to what Ms. Tomlinson was told, the women were not discussing petitioner's guilt but jury selection. Here again, not only is information hearsay, but it fails to show that Mrs. Kuhlman was involved in any improper contact or communication. In fact, it confirms what Mrs. Kuhlman stated during voir dire, namely, that she had contact with Mrs. Akins and Mrs. Burrows at the courthouse

---

[4] *Petitioner, therefore, has no argument that counsel was ineffective at trial with respect to this information.*

and that they said hello and talked about how it was going to be a long day (J. Tr. 1, 240). Counsel was therefore not ineffective for failing to raise this claim on appeal. <u>Freeman</u>, 536 F.3d at 1233.

## Failure to Effectively Impeach a State's Witness

Petitioner's next challenge to his counsel's performance relates to the cross-examination and impeachment of Oklahoma Highway Patrol Trooper Jarrett Iliff. Petitioner argues that "trial counsel failed to memorialize [Trooper Iliff's] inconsistent, contradictory statements by requesting that the trial court instruct the jury as to their options in determining the weight and credibility to give [Trooper] Iliff's testimony under the circumstances." Pet. at 6. Trooper Iliff was the one who had petitioner's blood drawn at the hospital. He also delivered the blood kit to the lab for testing. Petitioner's issues with Trooper Iliff include his keeping of the blood kit in his home refrigerator for ten days before taking it to the lab and his indication on the blood test affidavit that he mailed the kit when he actually hand delivered it. Petitioner also notes an inconsistency between Trooper Iliff's trial testimony and "[his] report prepared immediately after the accident"[5] regarding his

---

[5] *As discussed herein, counsel questioned the trooper about the inconsistency between his testimony and the recording made of the at-scene interview with Mr. Williams, not his report. Trooper Iliff testified that his patrol car was equipped with a DVD system and that his interview at the scene with Mr. Williams had been recorded (J. Tr. 2, 323-25, 326, 327, 342). As respondent has pointed out, Trooper Iliff's report is not a part of the record. Resp. at 21. Therefore, it is unknown whether Trooper Iliff's testimony was inconsistent with it. In addition, the court notes that petitioner's reference to the preliminary hearing transcript fails to support his contention that Trooper Iliff's trial testimony was inconsistent with his preliminary hearing testimony. See Pet. at 6. Petitioner's reference to the preliminary hearing transcript is not to Trooper Iliff's testimony but to the testimony of Mr. Williams (P.H. Tr. 7/6/11, 13-14). Trooper Iliff did not give any testimony at preliminary hearing regarding what Mr. Williams told him (<u>id.</u> at 17-45).*

interview at the scene with the surviving passenger, Lawrence Williams, and what Mr. Williams told him about petitioner's drinking prior to the accident. Id.

As previously noted, the OCCA denied relief on all of petitioner's ineffectiveness claims because it found that the trial court adequately addressed them. Kelln, No. PC 2015-0507, slip op. at 3. In denying petitioner relief with respect to trial counsel's handling of Trooper Iliff, the trial court found as follows: "all issues regarding [Trooper Iliff's] testimony were presented to the jury. He was examined and cross examined. Nor does this court find defense counsel's handling of the issues related to this witness deficient in any way." Resp't's Ex. 5 at 3. As the record clearly supports the trial court's findings, petitioner fails to show that the OCCA unreasonably denied him relief on this claim.

Again, as with his prior charge against his counsel, it is best to start with what counsel did do. On direct examination, Trooper Iliff testified that Mr. Williams identified petitioner as the driver and said he had been drinking (J. Tr. 2, 393). On cross-examination, counsel began by questioning Trooper Iliff about this testimony. Referring to Trooper Iliff's recorded interview of Mr. Williams, counsel asked whether what Mr. Williams actually said was that "he didn't know if they [petitioner and the victim] had been drinking." Trooper Iliff responded that he did not know. Although he had listened to the interview recently, Trooper Iliff testified that he did not remember what Mr. Williams actually said. Trooper Iliff admitted that the transcript of the recording would be accurate of what was said, but that he had not reviewed that (id. at 394-96, 397-98).

Mr. Williams also testified at trial. He testified that he spoke to Trooper Iliff at the scene and later gave a written statement (J. Tr. 2, 281-82, 291; State's Ex. 6). Although his written statement is silent on the issue, his testimony at trial was that he could not tell whether petitioner had been drinking that night (id. at 285).[6] He reiterated this testimony on cross-examination, stating that he did not believe petitioner was under the influence and that he was acting normal (id. at 299). Counsel thereafter concluded cross-examination of Mr. Williams by referring to his interview with Trooper Iliff and Mr. Williams' belief that the accident was due to petitioner being distracted, not intoxicated (id. at 311-13).

On cross-examination, counsel also questioned Trooper Iliff about the discrepancy on the blood test affidavit where he indicated that the blood kit would be delivered or mailed by U.S. Mail. Trooper Iliff admitted that it was a mistake. Counsel further questioned Trooper Iliff about his decision not to mail the kit and his storage of kit in his home refrigerator for ten days (J. Tr. 2, 396-97, 398-405, 419-20, 431-33).

In closing argument, counsel referenced Trooper Iliff's "mischaracterization of what Mr. Williams said," along with several other comments about Trooper Iliff's carelessness, lack of professionalism, and sloppiness. Counsel told the jury that Trooper Iliff "[had] completely impeached himself" (J. Tr. 3, at 650-63).

As shown above, counsel conducted an effective cross-examination of Trooper Iliff and devoted an extensive amount of his closing argument to the issue of Trooper Iliff's credibility. In addition, regarding the credibility of witnesses, the jurors were instructed

---

[6] This was consistent with his preliminary hearing testimony (P.H. Tr. 7/6/11, 16).

that it was their responsibility to make this determination and that in assessing credibility, they could consider such things as "the candor, fairness, intelligence, and demeanor of the witness" and "the ability of the witness to remember and relate past occurrences" (O.R. 394). Although petitioner wanted more in the form of an impeachment instruction,[7] the court concludes that this additional instruction would not have affected the jury's verdict. The issues regarding Trooper Iliff were clearly before the jury and the absence of an impeachment instruction did not keep the jury from fully assessing his credibility. And here again, the court must take note of the strong evidence against petitioner. From an evidentiary standpoint, this was an easy case for the State to prove. Petitioner's blood alcohol level was above the legal limit, he had prior drunk driving convictions, and he was the driver in a single truck accident that caused the death of his passenger. Irrespective of the issues involving Trooper Iliff, petitioner's conviction is well-supported by the evidence.

Based on the foregoing, neither <u>Strickland</u> prong was met with respect to counsel's actions at trial. It therefore follows that counsel was also not ineffective for failing to raise the claim on appeal. <u>Freeman</u>, 536 F.3d at 1233.

---

[7] *An impeachment instruction on prior inconsistent statements would have told the jury that evidence had been presented that Trooper Iliff made a statement inconsistent with his trial testimony and that they might consider that evidence in determining what weight and credit to give to his testimony.* <u>*See*</u> *OUJI-CR (2d) 9-20.*

## Failure to Obtain a Blood Alcohol Expert

Next, petitioner asserts that counsel was ineffective for failing to obtain an expert who could have challenged the results of his blood alcohol test.[8] Relying on information he obtained from the website of an Arizona attorney who specializes in defending drunk drivers (www.azduiatty.com/blood-test.htm), petitioner claims that the testing could have been challenged on multiple grounds.

In its denial of this claim, the trial court found petitioner's contentions to be unsupported: "It is true that defense counsel called no expert witnesses but [petitioner] offers no support for his contentions. He just asserts that, 'it is a well known fact.'" It also found that petitioner's issue with the ten-day delay in delivering the blood kit for testing had been litigated at trial and addressed in part on appeal.[9] Ultimately, the trial court found no error with trial counsel's failure to obtain an expert. Resp't's Ex. 5 at 3. On appeal, the OCCA concluded that petitioner had failed to show that the trial court's reasoning was erroneous. Kelln, No. PC 2015-0507, slip op. at 3.

---

[8] *Within this claim, petitioner also asserts that his trial counsel was unprepared for trial because he spent too much time negotiating a plea deal that petitioner had no intention of taking. The court has not construed this as a separate claim of ineffectiveness but only as further argument as to why petitioner believes an expert was not retained. In any event, a review of the trial transcript clearly shows that counsel was well-versed in the issues of petitioner's case and provided competent representation.*

*Tacked to the end of this claim, petitioner also asserts that counsel "was ineffective when he failed to object to the prosecution's request that the jury 'send a message' to Petitioner in his closing arguments." Pet. at 9. However, petitioner makes no citation to the record, and after review of the prosecution's closing arguments, the court has found no such comment. Therefore, the court concludes that petitioner has failed to demonstrate his entitlement to relief on this claim.*

[9] *See Ground Three, infra.*

Petitioner has not shown that the OCCA unreasonably denied him relief on this claim. While he argues that the testing of his blood could have been challenged on various grounds, his only support for his claim comes from the website of a DUI attorney who obtained the information from a discussion given by another attorney at a DUI symposium in 2000. This is hardly substantiated evidence sufficient to challenge his counsel's representation.

Regarding the testing that was conducted, the court notes that Oklahoma State Bureau of Investigation Forensic Toxicologist Paul Wallace testified that the blood kit came to him with the outer seal intact. The four vials inside the kit were also sealed. There was no evidence of tampering. One vial was selected at random for testing (J. Tr. 3, 474-75). The sample was tested twice and the results were .132 and .128. Using the lowest result, Mr. Wallace issued a report and testified that petitioner's blood alcohol level was .12 (id. at 480-84; State's Exs. 19, 24, and 25).

Mr. Wallace also testified that alcohol concentration is unaffected by temperature or a delay in testing of up to six months and perhaps longer. He testified that a preservative and an anticoagulant inside the vial maintain the integrity of the sample (and did so with the vial he tested); that the delay in testing in petitioner's case, from September 6, 2010, the day the blood was taken, to September 23, 2010, the day he tested it, would not have affected his analysis; and that while he admitted on cross-examination that he would not encourage storage of a blood kit in a personal refrigerator as Trooper Iliff did, it would not have damaged the blood in any way (id. at 485-89, 500-01, 506, 507).

Considering what petitioner has provided and what the evidence presented at trial showed, the court concludes that petitioner has not shown that the state courts were unreasonable in denying this claim. Again, counsel cannot be ineffective on appeal for failing to raise a meritless claim. Freeman, 536 F.3d at 1233.

## Conclusion

For the reasons set forth above, the OCCA was not objectively unreasonable in its determination that petitioner was not denied the effective assistance of counsel at trial or on appeal. Accordingly, petitioner's Ground One is denied.

### B.    Ground Two:    Petitioner's Statements.

In Ground Two, petitioner challenges the admission of statements he made to Trooper Iliff at the hospital.[10] Standing on the arguments he made to the OCCA on direct appeal,[11] petitioner contends that his statements to Trooper Iliff should have been suppressed because he was not given his Miranda[12] warnings. Petitioner additionally asserts that his statements were involuntary, that the trial court should have held a

---

[10] *Petitioner does not challenge the statements he made to Deputy Sheriff Thomas Bradt. At the scene of the accident, petitioner told Deputy Bradt that he was driving the vehicle, and at the hospital, he told Deputy Bradt that he had consumed two to three beers. Deputy Bradt testified as to these statements (J. Tr. 3, 510-13). Both Trooper Iliff and Deputy Bradt testified that Deputy Bradt told Trooper Iliff what petitioner had said (J. Tr. 2, 322, 357, 373; J. Tr. 3, 511).*

[11] *For his Grounds Two through Five, petitioner's request for relief is based on the arguments he made on direct appeal.*

[12] *Miranda v. Arizona, 384 U.S. 436 (1966).*

<u>Jackson v. Denno</u>[13] hearing, and that the jury should have been instructed concerning the voluntariness of the statements.  Pet. at 10; Resp't's Ex. 1 at 5-19.

In denying petitioner relief, the OCCA found that <u>Miranda</u> warnings were not required because petitioner was not in custody when the statements were made.  It also found that the statements were voluntary, that the failure to hold a <u>Jackson v. Denno</u> hearing was harmless beyond a reasonable doubt, and that there was no plain error in the trial court's failure to instruct the jury on the voluntariness of the statements.  <u>Kelln</u>, No. F-2012-375, slip op. at 2-4.  For the following reasons, petitioner has failed to show that the OCCA's denial of relief is unreasonable.

Before Trooper Iliff arrived at the scene, petitioner had already been transported to the hospital by ambulance (J. Tr. 2, 280-81, 322-23; J. Tr. 3, 511).  Trooper Iliff went from the crash scene to the hospital to make contact with petitioner.  At the hospital, Trooper Iliff identified himself to petitioner and asked him what happened.  Petitioner told him that "he didn't exactly know."  Trooper Iliff asked him where they were going and where they had been and petitioner again told him that "he didn't know."  Trooper Iliff asked petitioner how much he had to drink and petitioner said again, "I don't know."  Beyond these uninformative answers, petitioner did tell Trooper Iliff that he had not had any alcohol after

---

[13] *378 U.S. 368 (1964). In <u>Jackson</u>, 378 U.S. at 376-77, the Supreme Court held that a defendant has a "constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession."*

the crash (J. Tr. 2, 353-54, 357).[14]  Petitioner was not under arrest at the time he made these statements (J. Tr. 2, 354-55).   In addition to Trooper Iliff's testimony about these statements, the video camera from Trooper Iliff's patrol car captured the audio of his interaction with petitioner at the hospital (J. Tr. 2, 379-80; State's Ex. 16).

In Miranda, 384 U.S. at 444, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  Miranda therefore requires that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Id.

"Miranda warnings are required when a person is 'in custody.'"  United States v. Berres, 777 F.3d 1083, 1092 (10th Cir. 2015).  "'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."  Howes v. Fields, 565 U.S. 499, 508-09 (2012).  Looking at the circumstances objectively, the first question is whether "a reasonable person [would] have felt he . . . was not at liberty to terminate the interrogation and leave."  Id. at 509 (internal quotation marks and citation omitted).  Relevant circumstances "include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical

_____

[14] *The purpose of this question was to make sure petitioner's blood alcohol level had not been inflated since the accident (J. Tr. 3, 354).*

24

restraints during the questioning, and the release of the interviewee at the end of the questioning. Id. (citations omitted). Because "[n]ot all restraints on freedom of movement amount to custody for purposes of Miranda," the second question is "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Id.

In finding that petitioner was not in custody when he made statements to Trooper Iliff, the OCCA held as follows:

> Miranda warnings must be given if a person is in custody or otherwise significantly deprived of freedom of action. Bryan v. State, 1997 OK CR 15, ¶ 15, 935 P.2d 338, 351. A person is in custody if, in the same circumstances, a reasonable person would not feel free to leave. Michigan v. Chesternut, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). This "free to leave" principle depends in part on the location of the encounter; we ask whether, taking all the circumstances into account, police conduct "would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." Florida v. Bostick, 501 U.S. 429, 435-37, 111 S.Ct. 2382, 2387-88, 115 L.Ed.2d 389 (1991). We consider how a reasonable person in the defendant's position would have understood the situation. Underwood v. State, 2011 OK CR 12, 20, 252 P.3d 221, 235. Before Ifill [sic] arrested [petitioner] and read him the implied consent form, his freedom of movement was restricted by hospital personnel and the need to treat his injuries, not by law enforcement. Considering all the circumstances, we find that [petitioner] was not in custody when he made the statements to Ifill [sic]. Crawford v. State, No. F-2006-367 (Okl.Cr. May 2, 2007) (not for publication).

Kelln, No. F-2012-375, slip op. at 2-3 (footnote omitted). This is a reasonable determination. Petitioner was questioned at the hospital where he was being treated for his injuries.[15] When questioned, he was lying on a gurney in the emergency room (J. Tr. 2,

---
[15] On State's Ex. 16, a nurse can be heard telling Trooper Iliff that one of petitioner's kidneys is unstable and three times the size of the other one. In his reply, petitioner provides

353). He was not handcuffed or restrained. While Trooper Iliff encouraged petitioner to talk, he did not threaten him. The questions were basic and questioning lasted only a few minutes. Under these circumstances, it was not unreasonable for the OCCA to conclude that petitioner was not in custody for purposes of Miranda.

Petitioner's remaining claims are also without merit because they are supported by the same argument as his Miranda claim. Petitioner asserts that because he was in custody and not read his Miranda rights, his statements to Trooper Iliff were involuntary, and because the trial court failed to hold a Jackson v. Denno hearing and instruct the jury regarding its consideration of his statements,[16] the issue of whether his statements were voluntary was not properly considered by the trial court or the jury. In denying petitioner relief on these additional claims, the OCCA reasoned as follows:

> We further find that [petitioner's] statements to Ifill [sic] were voluntary. Miranda warnings are required where questioning or other forms of interrogation occur after a suspect has been taken into custody or significantly deprived of freedom of action by law enforcement officers. McGregor v. State, 1994 OK CR 71, ¶ 13, 885 P.2d 1366, 1377; Rhode Island v. Innis, 446 U.S. 291, 298-99, 100 S.Ct. 1682, 1688-89, 64 L.Ed.2d 297 (1980). Because we found [petitioner] was not in custody when Ifill [sic] questioned him, no Miranda warnings were required. [Petitioner] argues that his statements were not voluntary. When considering whether a statement is voluntary, we look at all the circumstances to find whether the statement is made pursuant to a free and unconstrained choice, or whether it results from coercion, threats, violence, or promises. Van White v. State, 1999 OK CR 10, ¶ 46, 990 P.2d 253, 267-68. [Petitioner] spoke to Ifill [sic] before he was arrested, while he was being treated for injuries at the emergency room.

---

*additional information about his medical condition following the accident. According to petitioner, he also had a collapsed lung. Reply, Ex. 3 at 2.*

[16] *Petitioner claims that the jury should have been given OUJI-CR (2d) 9-12 and 9-13, regarding the jury's duty to determine the voluntariness of his statements and find corroboration for confessions.*

While [petitioner's] subsequent blood test showed that he was under the influence of alcohol when he made the statements, this alone does not render his statements involuntary. Lee v. State, 1985 OK CR 62, ¶ 13, 700 P.2d 1017, 1020; Hardin v. State, 1982 OK CR 124, ¶ 9, 649 P.2d 799, 801. The record does not show that [petitioner's] intoxication or his injuries deprived him of the ability to understand the meaning and effect of his statements.

The trial court's failure to hold a Jackson-Denno hearing was harmless beyond a reasonable doubt. Davis v. State, 1999 OK CR 16, ¶ 25, 980 P.2d 1111, 1118; Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). [Petitioner] was not in custody when the statements were made. Jackson-Denno hearings are held to decide whether statements made during police questioning are voluntary, or the product of police coercion, whether or not the suspect is in custody. Davis, 1999 OK CR 16, ¶ 25, 980 P.2d at 1118. Where a trial court, during a Jackson-Denno hearing, finds that a statement or confession is voluntary, the court should then instruct jurors to consider the voluntariness of the statement. Parent v. State, 2000 OK CR 27, ¶ 17, 18 P.3d 348, 351-52; OUJI-CR 2d 9-12, 9-13. [Petitioner] neither objected to the instructions given nor requested these instructions, and we review for plain error. Barnard v. State, 2012 OK CR 15, ¶ 13, 290 P.3d 759, 764. There is none. The trial court here neither held a Jackson-Denno hearing nor made a record of any findings concerning the voluntariness of the statements. However, we found that [petitioner] was not in custody when the statements were made. The record does not support any conclusion that [petitioner's] non-custodial statements were coerced. Further, the statements were corroborated by independent evidence that [petitioner] was driving the pickup and had been drinking. There was no plain error in the omission of these instructions. Jones v. State, 2006 OK CR 5, ¶ 39, 128 P.3d 521, 538-39.

Kelln, No. F-2012-375, slip op. at 3-4.

Petitioner has not shown that his statements were involuntary based on the absence of Miranda warnings.  Because petitioner was not in custody, Miranda warnings were not required.  It therefore follows that the absence of a hearing on the voluntariness of his statements is of no consequence, and it was not unreasonable for the OCCA to deny relief based on harmless error.  See Lucero v. Kerby, 133 F.3d 1299, 1311 (10th Cir. 1998) (to obtain habeas relief based on the failure of the trial court to hold a Jackson v. Denno

hearing, a "petitioner must . . . also show his version of events, if true, would require the conclusion that his confession was involuntary") (internal quotation marks and citation omitted).

Petitioner's instructional challenge also fails. "A habeas petitioner who seeks to overturn his conviction based on a claim of error in the jury instructions faces a significant burden." Ellis v. Hargett, 302 F.3d 1182, 1186 (10th Cir. 2002). "Unless the constitution mandates a jury instruction be given, a habeas petitioner must show that, in the context of the entire trial, the error in the instruction was so fundamentally unfair as to deny the petitioner due process." Tiger v. Workman, 445 F.3d 1265, 1267 (10th Cir. 2006). Again, petitioner has failed to show that his statements were involuntary, and in addition, the OCCA found no plain error where petitioner did not object to the given instructions and his statements were corroborated by other evidence. Under these circumstances, petitioner was not denied a fair trial by the absence of the instructions.

In conclusion, for the reasons set forth above, petitioner has not demonstrated his entitlement to relief on Ground Two. It is therefore denied.

## C.    Ground Three:    Insufficient Evidence.

Petitioner's third ground for relief is a challenge to the sufficiency of the evidence. Petitioner asserts that because there was a break in the chain of custody of the blood kit, his blood test results should not have been admitted. Without the results, which showed his blood alcohol level to be above the legal limit, he contends that the evidence was insufficient to support his conviction.

Jackson v. Virginia, 443 U.S. 307, 319 (1979), sets forth the familiar standard of review for sufficiency of the evidence claims: "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." As the Jackson Court noted,

> [t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

Id. (footnotes omitted). Judicial review, therefore, is "'sharply limited'" and a reviewing court "must accept the jury's determination as long as it is within the bounds of reason." Boltz v. Mullin, 415 F.3d 1215, 1232 (10th Cir. 2005) (citations omitted). "[T]he Jackson inquiry does not focus on whether the trier of fact made the *correct* guilt . . . determination, but rather whether it made a *rational* decision to convict . . . ." Herrera v. Collins, 506 U.S. 390, 402 (1993). See also Jackson, 443 U.S. at 318-19 (the question is not whether the reviewing court itself believes that the evidence is sufficient to establish a defendant's guilt beyond a reasonable doubt). Thus, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.

In addition to the deference afforded a jury's verdict by <u>Jackson</u>, the AEDPA adds another layer of deference to the court's review of a sufficiency claim.

> The opinion of the Court in <u>Jackson</u> . . . makes clear that it is the responsibility of the jury–not the court–to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

<u>Cavazos v. Smith</u>, 565 U.S. 1, 2 (2011) (per curiam) (citation omitted). <u>See</u> <u>also</u> <u>Parker v. Matthews</u>, 567 U.S. 37, 43 (2012) (referring to habeas review of sufficiency claims as a "twice-deferential standard"); <u>Coleman v. Johnson</u>, 566 U.S. 650, 651 (2012) (per curiam) (noting that <u>Jackson</u> claims "are subject to two layers of judicial deference").

Petitioner raised this claim on direct appeal. Applying the standard set forth in <u>Jackson</u>, the OCCA denied relief. <u>Kelln</u>, No. F-2012-375, slip op. at 7.[17] The OCCA analyzed the claim as follows:

> We find in Proposition III that, taking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that [petitioner] caused Akins' death in the commission of felony driving under the influence, while driving a motor vehicle on a public highway with a blood alcohol content over .08. <u>Easlick v. State</u>, 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559. [Petitioner] argues the results of his blood test should not have been admitted due to an alleged break in the chain of custody. The chain of custody rule is intended to guard against substitution or tampering with evidence between the time it is collected and the time it is

---

[17] *The OCCA cited <u>Easlick v. State</u>, 90 P.3d 556, 559 (Okla. Crim. App. 2004), wherein it held that the standard set forth in <u>Spuehler v. State</u>, 709 P.2d 202 (Okla. Crim. App. 1985), would be applied to all sufficiency of the evidence claims. In <u>Spuehler</u>, the OCCA applied the <u>Jackson</u> standard. <u>Spuehler</u>, 709 P.2d at 203-04.*

analyzed. <u>Alverson v. State</u>, 1999 OK CR 21, ¶ 22, 983 P.2d 498, 509. For admissibility, the State need not disprove all possibility of alteration. <u>Mitchell v. State</u>, 2010 OK CR 14, ¶ 74, 235 P.3d 640, 657-58. Any speculation that an impropriety may have occurred in an otherwise sufficient chain of custody goes to the weight of the evidence, not its admissibility. <u>Anderson v. State</u>, 2010 OK CR 26, ¶ 4, 252 P.3d 211, 212. A trial court considers, and we review, "(1) the nature of the article; (2) the circumstances surrounding its preservation; and, (3) the likelihood of contamination, alteration or tampering." <u>Driskell v. State</u>, 1983 OK CR 22, ¶ 60, 659 P.2d 343, 354. [Petitioner] offers only speculation regarding any possibility that the blood kit was tampered with or altered between the time it was sealed and its delivery to the OSBI lab. <u>Faulkenberry v. State</u>, 1976 OK CR 131, 551 P.2d 271, is not analogous. While <u>Faulkenberry</u> had a ten-day delay in delivery of the exhibit to the lab, the real problem with chain of custody was that there was no evidence as to how the exhibit was delivered, or where it was during the ten days. <u>Faulkenberry</u>, 1976 OK CR 131, ¶ 7, 551 P.2d at 273. No such uncertainty exists here.

<u>Kelln</u>, No. F-2012-375, slip op. at 7. This is a reasonable determination.

Petitioner contends that a break in the chain of custody occurred when Trooper Iliff kept the blood kit in his personal refrigerator for ten days. During this ten-day period, petitioner asserts that "[t]he blood was subject to differing degrees of temperature and exposure to food substances." He further asserts that "it was exposed to numerous occupants of a personal residence and was not in a secure location." Because of these issues, petitioner contends that "[t]he trial court and the jury were left to speculate if the blood sample delivered to the OSBI lab was in the same condition as the sample originally obtained by the patrolman." Resp't's Ex. 1 at 25, 26. Given these circumstances, petitioner argues that the State failed to lay a proper foundation for the admission of the evidence. In the absence of this foundation, petitioner asserts that his blood test results should not have been admitted and that without his blood test results, there is insufficient evidence to support his conviction.

As discussed in Ground One, <u>supra</u>, the State presented evidence that when the blood kit arrived at the lab for testing, it was sealed, each vial inside was sealed, and there was no evidence of tampering (J. Tr. 3, 474-75). The State also presented evidence that the storage of the blood kit in Trooper Iliff's refrigerator did not affect the integrity of the blood samples (<u>id.</u> at 485-86, 500-01, 506). Given this evidence, it was reasonable for the OCCA to conclude there was no error in admitting his blood test results and that petitioner's conviction is supported by sufficient evidence. Ground Three is therefore denied.

### D.    Ground Four:    Expert Opinion.

In Ground Four, petitioner asserts that Oklahoma Highway Patrol Trooper Linda Hartley should not have been allowed to testify as an expert witness. Petitioner contends that Trooper Hartley was unqualified to give accident reconstruction testimony. He also contends that her testimony was improper because it went to the ultimate issue of his guilt. The OCCA addressed this claim on direct appeal and denied relief. <u>Kelln</u>, No. F-2012-375, slip op. at 8-9.

Petitioner's claim is a state law evidentiary claim which is subject to fundamental fairness review.[18] <u>See</u> <u>Revilla v. Gibson</u>, 283 F.3d 1203, 1212 (10th Cir. 2002) (challenges to expert testimony are subject to review for fundamental fairness). When a petitioner

---

[18] *Although petitioner references <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), in his request for relief, "[b]ecause <u>Daubert</u> does not set any specific constitutional floor on the admissibility of scientific evidence, the only relevant question is whether the [admitted evidence] rendered the trial fundamentally unfair." <u>Wilson v. Sirmons</u>, 536 F.3d 1064, 1101-02 (10th Cir. 2008).*

challenges the admission of evidence, "the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" where the admitted evidence "is so unduly prejudicial that it renders the trial fundamentally unfair." Payne v. Tennessee, 501 U.S. 808, 825 (1991). Undefined by specific legal elements, this standard obliges the court to "tread gingerly" and "exercise considerable self-restraint." Duckett v. Mullin, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotation marks and citation omitted) (quoting United States v. Rivera, 900 F.2d 1462, 1477 (10th Cir. 1990)). Relief is warranted in only "the most serious cases, which truly shock the conscience as well as the mind." Rivera, 900 F.2d at 1477 (internal quotation marks and citation omitted).

An alleged evidentiary error is not viewed in isolation, but is considered in light of the entire proceeding. As acknowledged in Rivera, "a fundamental-fairness analysis is heavily dependent upon the peculiar facts of an individual trial." Id. Thus, "inquiry into the fundamental fairness of the trial requires an examination of the entire proceedings, including the strength of the evidence against the defendant." Hanson v. Sherrod, 797 F.3d 810, 843 (10th Cir. 2015).

Trooper Hartley testified that she was the head of the Troop J fatality collision team and that she had been a part of the team for seven to eight years. She had specialized training in accident reconstruction, which consisted of her completion of five or six two-week classes conducted by International Police Technology (J. Tr. 3, 529-30). After giving detailed testimony about her investigation and findings, Trooper Hartley testified that in her opinion, petitioner failed to negotiate the curve because he was speeding and was under

the influence of alcohol (id. at 563-64, 565-66, 569). Petitioner made no substantive

objection to Trooper Hartley's testimony.[19]

In denying petitioner relief, the OCCA held as follows:

> We find in Proposition IV that the trial court did not abuse its discretion in admitting this testimony, and there was no plain error. Barnard, 2012 OK CR 15, ¶ 13, 290 P.3d at 764. A witness qualified as an expert by knowledge, skill, experience, training or education may testify to an opinion as to scientific, technical or other specialized knowledge. 12 O.S.2011, § 2702. The expert testimony must be based on sufficient facts or data, and the product of reliable principles and methods, and the witness must have applied those principles and methods reliably to the facts of the case. Id. Expert opinion evidence may reach the ultimate issue in a trial, as long as it does not merely tell a jury what result to reach. Ball v. State, 2007 OK CR 42, ¶ 15, 173 P.3d 81, 86; Romano v. State, 1995 OK CR 74, ¶ 21, 909 P.2d 92, 109. Whether a person may testify as an expert is a matter within the trial court's discretion. Lott v. State, 2004 OK CR 27, ¶ 96, 98 P.3d 318, 344. As long as the appropriate evidence is offered and admitted regarding a witness's expert qualifications, the Evidence Code does not explicitly require a trial court to state that a witness is an expert on the record. 12 O.S.2011, ¶¶ 2702, 2703. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999), govern admissibility of scientific and other technical or specialized evidence. This Court, adopting Daubert, has held that it requires trial courts to ensure that novel scientific, technical or specialized evidence is reliable and relevant. Day v. State, 2013 OK CR 8, ¶ 6, 303 P.3d 291, 295-96; Taylor v. State, 1995 OK CR 10, ¶ 17, 889 P.2d 319, 329. Testimony established Hartley as having specialized training and knowledge in the area of accident reconstruction. [Petitioner] has made no showing that accident reconstruction is so novel as to require a Daubert/Kumho hearing. [Petitioner's] jury was properly instructed on consideration of expert testimony.

Kelln, No. F-2012-375, slip op. at 8-9. This is not an unreasonable determination.

---

[19] *In his only objection, petitioner claimed that the prosecutor was leading the witness. The objection was overruled (J. Tr. 3, 570).*

Petitioner has not shown that he was denied a fundamentally fair trial by the admission of Trooper Hartley's testimony. A review of her testimony supports the OCCA's finding that she had the necessary knowledge and training to give expert testimony, and contrary to petitioner's assertion, her opinion did not tell the jury that he was guilty. Moreover, given the other evidence of petitioner's guilt, there is no persuasive basis for an argument that this evidence denied petitioner a fair trial. The OCCA reasonably denied relief, and therefore, petitioner's Ground Four is denied.

### E.    Ground Five:    Prosecutorial Misconduct.

In Ground Five, petitioner asserts that he was denied a fair trial due to prosecutorial misconduct in both voir dire and closing argument. For the following reasons, petitioner has failed to show that the OCCA's denial of this claim was unreasonable. See Kelln, No. F-2012-375, slip op. at 9-10.

"Prosecutors are prohibited from violating fundamental principles of fairness, which are basic requirements of Due Process." Hanson, 797 F.3d at 843. Therefore, when a petitioner alleges prosecutorial misconduct, the question is whether the prosecutor's actions or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Evaluating the alleged misconduct in light of the entire proceeding, the reviewing court must determine "whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." Bland v. Sirmons, 459 F.3d 999, 1024 (10th Cir. 2006).

During voir dire, the prosecutor asked questions regarding prospective jurors' knowledge and acceptance of the felony-murder rule. The prosecutor asked whether they

knew that a second DUI was a felony and whether they could accept the fact that when someone dies during the commission of a felony, that constitutes murder in the second degree. Although these questions elicited more than one objection from trial counsel, the prosecutor was able to discover one juror who had an adamant belief that the felony-murder rule was "B.S." Because of his belief, that juror was removed (J. Tr. 1, 82-89, 192).

Petitioner does not assert that the prosecutor misstated the law, but that he overstepped his bounds. Petitioner contends that by discussing how the felony-murder rule works, the prosecutor in effect instructed the jury on the law, which is the trial court's responsibility.

In denying petitioner relief, the OCCA noted that "[t]he purpose of *voir dire* is to reveal juror bias and give each party enough information to challenge jurors for cause and permit the intelligent exercise of peremptory challenges." It also noted that "[t]he manner and extent of voir dire is within the trial court's discretion." The OCCA found that "the trial court did not abuse its discretion in allowing *voir dire* questioning about an unusual area of law, specifically designed to discover juror bias." Kelln, No. F-2012-375, slip op. at 9. This is not unreasonable. The prosecutor's questions were relevant to determine if the prospective jurors could follow the law and they did in fact uncover a juror who could not. This is the very purpose of voir dire. Petitioner was therefore not denied a fair trial by the prosecutor's questions and the OCCA's resolution of that issue was not unreasonable.

Petitioner's remaining complaints concern closing argument. Petitioner asserts that the prosecutor (1) made comments which played upon the sympathies of the jurors by

referring to how violent the accident was and by describing the victim's injuries (J. Tr. 3, 643, 644, 671); (2) expressed his personal opinion that petitioner was guilty (<u>id.</u> at 664); (3) improperly referred to witnesses as experts even though they were not formally qualified as experts by the trial court (<u>id.</u> at 633); (4) improperly told the jury that they could decide which witnesses they did not like (<u>id.</u>); and (5) misstated the evidence when he referred to a vehicle going seventy to eighty miles per hour (<u>id.</u> at 639-40). None of these comments elicited an objection.

In denying petitioner relief on these claims, the OCCA noted that in closing argument, "both parties have wide latitude to discuss the evidence and inferences from it." It then applied a fundamental fairness review, concluding that "the prosecutor limited closing argument to proper argument and inferences from the evidence, did not improperly appeal to jurors' sympathy, did not improperly define the jury's role, and did not misstate facts." <u>Kelln</u>, No. F-2012-375, slip op. at 9-10.

Reviewing each comment, the court reaches the same conclusion. The prosecutor's comments about the accident and the victim's injuries were based upon the presented evidence. The victim was ejected from the truck as it rolled. The truck then rolled over the victim's body causing fatal injuries and a bloody scene (J. Tr. 2, 273-74, 345-47; J. Tr. 3, 550, 590-91, 595, 611; State's Ex. 48). As for the comment about petitioner's guilt, the comment in context was as follows:

> Well, let's think a minute about what we did here. I told you it's a human tragedy and it is. Brian Akins is dead. And he's dead forever. And that tragedy could have been stopped by that Defendant right over there. He's the one that was driving. He's the one that decided to drive.

This tragedy wasn't caused by Lawrence Williams. This tragedy wasn't caused by Brian Akins. This tragedy was caused by Mr. Kelln, the Defendant.

(J. Tr. 3, 664). This is not a personal expression of guilt, but again proper argument based upon the presented evidence.

The prosecutor's comments about the witnesses were also not improper. With respect to expert testimony, the prosecutor directed the jury to the instruction on expert witnesses and then stated as follows:

And what you heard from is Paul Wallace, who was the chemist. You heard from Chai Choi with the Medical Examiner's Office, and you heard from Jerson Peneflor, who drew the blood. Those are all what I would consider experts, and I would ask you to take a look at that instruction.

(J. Tr. 3, 632-33). It is irrelevant whether these witnesses were formally recognized as experts, see Kelln, No. F-2012-375, slip op. at 8 ("[T]he Evidence Code does not explicitly require a trial court to state that a witness is an expert on the record."), and contrary to petitioner's assertion, the comment did not invite the jury to speculate on the weight to be given to their testimonies. The prosecutor simply directed the jury to the appropriate instruction concerning expert testimony. As for the prosecutor's additional comment, there is no error here either. The prosecutor told the jurors that they get to decide who is "telling the truth" and "[w]hich ones [they] don't like" (J. Tr. 3, 633). This is clearly proper argument telling the jurors that witness credibility is their determination to make (O.R. 394).

Finally, there was no misstatement of fact. First of all, the prosecutor's comment was a general statement about how fast vehicles are capable of traveling – "a vehicle that

will run seventy, eighty miles an hour . . ." (J. Tr. 3, 639-40). But even if it is construed as how fast petitioner was going in the present case, it is supported by the evidence as Trooper Hartley testified that petitioner's truck was travelling at a *minimum* of seventy-one miles per hour when he started into the curve (id. at 565-66).

Petitioner's Ground Five is denied.

### F.    Ground Six:       Cumulative Error.

In his final ground, petitioner seeks relief based upon a cumulative error theory. "A cumulative-error analysis . . . aggregates all the errors that individually have been found to be harmless . . . and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Rivera, 900 F.2d at 1470. A petitioner has no basis for cumulative error relief in the absence of two or more errors. Hanson, 797 F.3d at 852. With respect to Ground Two, the OCCA found harmless error in the trial court's failure to hold a Jackson v. Denno hearing. No other error was found by the OCCA or by this court. Accordingly, petitioner's Ground Six is denied.

### IV.  Conclusion.

Having concluded that petitioner's arguments do not establish a right to relief, his petition for writ of habeas corpus is **DENIED**. Doc. 1. A certificate of appealability is also **DENIED**. Judgment will enter accordingly.

**IT IS SO ORDERED**.

Dated this 20th day of November, 2017.


JOE HEATON
CHIEF U.S. DISTRICT JUDGE